J-S60044-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.W. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 792 WDA 2017 |

Appeal from the Decree May 4, 2017
in the Court of Common Pleas of Blair County
Orphans' Court at No(s):  No. 2017 AD 3

BEFORE:   OLSON, DUBOW, JJ., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:               **FILED OCTOBER 16, 2017**

Appellant, K.W. ("Father"), files this appeal from the decree dated May 3, 2017, and filed May 4, 2017,[1] in the Blair County Court of Common Pleas, Orphans' Court division ("trial court"), granting the petition of Blair County Children, Youth, and Families ("BCCYF") and involuntarily terminating his

_____

* Former Justice specially assigned to the Superior Court.

[1] While docketed as filed by the Blair County Prothonotary's Office on May 4, 2017, there is no notation on the docket or otherwise that notice was ever given and that the order was entered for purposes of Pa.R.C.P. 236(b).  Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)." Pa.R.A.P. 108(b).  Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." *Frazier v. City of Philadelphia*, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999) (emphasis added).  We caution the Blair County Prothonotary's Office with regard to compliance with these rules.

parental rights to his minor daughter, S.A.W. ("Child"), born in October 2013, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a), (2), (5), (8), and (b).[2] After a careful review, we affirm the trial court's decree.

The trial court summarized the relevant procedural and factual history as follows:

This matter begins with an ongoing [BCCYF] dependency matter. The Termination of Parental Rights Hearing incorporated the record for dependency proceedings….[BCCYF] filed a Shelter Care Application and Emergency Protective Custody Application on February 19, 2016 and Dependency Petition followed on February 23, 2016. All three petitions involved the fact that [Child], a Type 1 diabetic, had a dangerously high sugar reading due to Mother giving [Child] sugar intense foods, despite the in-home education and services Kids First and Home Nursing[3] since November 2016. The providers had serious concerns that the parents' capacity to meet the medical needs of [Child] remain unchanged, despite the education provided. [BCCYF] placed the two older sibling brothers in emergency custody and [*sic*] Maternal Great-Grandparents[4] and [BCCYF] received custody of [Child]. After a short time the [g]reat-[g]randparents agreed to take custody of [Child]; however, it overwhelmed the [g]reat-[g]randmother and[,] on March 4, 2016[,] the [c]ourt

_____

[2] By the same decree, the trial court involuntarily terminated the parental rights of A.W. ("Mother") with respect to the Child. Mother has neither filed a separate appeal nor is she a party to the instant appeal.

[3] Upon review, services with Home Nursing Care commenced on January 12, 2016. N.T., 10/4/16/, at 29.

[4] Mother and Father additionally have two sons, one older and one younger than Child, who are not the subject of this matter. While dependency petitions were also filed with regard to these two children by BCCYF, the petitions were ultimately withdrawn. N.T., 10/4/16/, at 1. The children voluntarily reside with Mother's grandparents in Luzerne County. N.T., 5/3/17, at 43-44.

transferred custody to [BCCYF] resulting in [Child's] placement into foster care. The foster home has managed [Child's] diabetes quite well and she continues to improve, stabilize and meet all other developmental benchmarks in a family fashion.

The agency began reunification services with the parents.

The parents separated and Father lived locally with the two (2) sons in his own residence and then with friends after his landlord experienced tax difficulties with the trailer in which Father resided.

At the time of the 6-month review, Father had the more stable situation and had worked with the providers who were offering reunification services and had maintained his mental health treatment.

***

On October 5, 2016, at the 6-month review the [c]ourt learned Father had moved to Wayne County with his [m]other and the [c]ourt ordered a referral to Wayne County Children, Youth and Families so [Child] could return to her [f]ather and brothers and receive supportive services through Wayne County Children, Youth and Families. Mother and Father continued contact with [Child]; however, the geographic distance created logistical challenges.[5] Based upon the [c]ourt direction to transfer this matter to Wayne County, reunification stopped in Blair County as factually impossible to accomplish.

By the 9-month permanency review hearing, Father had experienced a falling out with his [m]other and the referral to Wayne County never came to fruition due to the Father's instability as reported by the [p]aternal [g]randmother. Father continued to experience an escalation of his depression due to his frustration with agency rules and directives and a sense of hopelessness and grief about the loss of his daughter.

Due to Father's struggles, the agency requested a change in goal from reunification with Father to adoption[,] which the [c]ourt granted on November 22, 2016. The [c]ourt note[d] the reason for the change of goal as "[M]other or Father are not

---

[5] Mother had relocated to Luzerne County at the time.

presenting capacities to care for the extreme risk related to [Child's] medical treatment."

\*\*\*

At the 12-month review, Father had developed some stability. Specifically, this [c]ourt noted "[F]ather has consistently visited the child, has saved money for his own residence, has completed his training for medical care of [Child's] diabetes to his knowledge, and has maintained contact with his other children while they reside with family out of county so he can reside here and stay close to [Child] for visits. He is finishing his workers' compensation benefits and will return to work when released to do so." Father indicated he had established a residence with his girlfriend's parents as a temporary spot and had their help and support for his efforts to reunify with [Child]; however, they did not want their home assessed or visited by [BCCYF].

[BCCYF] had scheduled the Termination of Parental Rights for the same day as the 12-month review,[6] although Father did not have counsel and [BCCYF] had not accomplished 10-day notice for Mother[,] so the [c]ourt rescheduled those proceedings for May 3, 2017[,] and gave direction to [BCCYF] to assist Father in determining the status of his medical care training records and to assess Father's current living arrangements[.] [The court] specifically stat[ed]…"although a Termination of Parental Rights is scheduled for May 3, this [c]ourt directs [BCCYF] to continue to concurrently explore the possibility of a return to the Father and support his efforts so the [c]ourt can make a fair determination of issues and resources in the life of [Child]."

Trial Court Opinion ("T.C.O."), 6/23/17, at 2-6 (citations to record and footnote omitted) (footnotes added).

_____

[6] BCCYF filed a petition to terminate Mother and Father's parental rights on February 15, 2017.

- 4 -

The trial court held a termination hearing on May 3, 2017. BCCYF presented the testimony of the current caseworker, Mackenzie Bagley, and Peritech Pediatric Home Health Agency registered nurse, Patricia Parks.[7] The court additionally incorporated the prior dependency proceedings. N.T., 5/3/17, at 2-3. Father was not present, but was represented by counsel. *Id.* at 1.

Following the hearing, by decree dated May 3, 2017, and filed May 4, 2017, the trial court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[8] On May 31, 2017, Father, through appointed counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

I.    Whether the trial court erred and/or abused its discretion when it found clear and convincing evidence existed to terminate [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2)?

II.   Whether the trial court erred and/or abused its discretion when it found clear and convincing evidence existed to

---

[7] Subsequent to termination, the court proceeded to a status review and additionally heard testimony from Mother's cousin, H.D. N.T., 5/3/17, at 66-67.

[8] This decree and order memorialized the decision placed by the court on the record at the conclusion of the hearing.

terminate [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5)?

III. Whether the trial court erred and/or abused its discretion when it found clear and convincing evidence existed to terminate [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8)?

IV. Whether the trial court erred and/or abused its discretion when it found clear and convincing evidence existed to terminate [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004)

(citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter*

*of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider

- 8 -

any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b) (bold in original).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)).

In the instant matter, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court reasoned as follows:

Here, neither Mother nor Father has provided a stable home for themselves or any of their three (3) children since the finding of dependency for [Child]. After separation[,] each parent has struggled with mental health matters, moved out of county and then returned, which created impossible conditions for any meaningful services to build parenting capacities or a reunification. At the 12-month review, Father had progressed

- 9 -

and stabilized by his own report; however, he then failed to appear for the rescheduled Termination of Parental Rights Hearing[,] despite knowing the nature of the hearing and what rights he jeopardized. He also failed to advantage himself by communicating facts or evidence of his situation or intentions with his attorney. Father lived with the Mother when Mother was fabricating the sugar readings for [Child] and he had sufficient reasons to understand the critical nature of his daughter's medical condition, yet his incapacity to create stability gives the [c]ourt reason to believe that the causes of his incapacity cannot and will not be remedied. Shirley Bowser testified that[,] after the first unfounded child abuse matter in September 2015, [BCCYF] continued to provide General Protective Services for the family[.] Mother was not managing the diabetes readings well and Shirley discussed it with the Father. Father agreed to begin to take responsibility to do so, but never accomplished that intention. One of [Child's] nurses[,] Amy Dodson, also testified that[,] in February of 2016[,] when she visited the home, she learned that Father was aware [Child] had high sugar since they had been on a trip, had not documented those reading[s] and had awareness that [Child] had Fruit Loops for breakfast[,] which contained sugar. He justified the actions by indicating they had been away and had not made it to the store yet.

T.C.O. at 8-10.

Father, however, argues that the record does not establish his incapacity, abuse, neglect or refusal and that, if it did, it does not evidence that he could not or would not remedy the issue. Father's Brief at 13. Father maintains that the record does not contain evidence of his incapacity, abuse, neglect or refusal, but rather focuses on the actions of Mother, which led to Child's removal and placement. *Id.* at 13-15. While acknowledging testimony of providing Child an inappropriate cereal and of knowledge of Mother's false reporting of glucose readings, Father asserts that he was

unable to challenge this testimony through cross-examination or rebuttal.[9] *Id.* at 16.  He further notes that the trial court expressed its desire for him to have an opportunity to display his capacity a mere three months prior to termination.  *Id.* at 17.  Moreover, Father contends that the record does not support that he cannot or will not remedy the issues, noting his completion of diabetes education and numerous attempts to complete additional education and training.  *Id.* at 18.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2).  The evidence corroborates Father's inability to safely and appropriately manage and care for Child's diabetes, despite education and training, as well as his instability.  Further, Father cannot or will not remedy these circumstances.

Shirley Bowser, assessment unit caseworker for BCCYF, testified that a child abuse investigation was opened in September 2015 due to alleged medical neglect of Child, who was diagnosed with Type I diabetes in March 2015.  N.T., 11/21/16, at 10, 59-60.  Despite the investigation being unfounded, Ms. Bowser noted ongoing concerns and a general protective services case remained open with BCCYF, with BCCYF monitoring Child's care and initiating services.  *Id.* at 60-61.  Critically, Ms. Bowser reported

_____

[9] While Father, who was *pro se* at the time, was not present on November 21, 2016, he was present on October 4, 2016 for some of the relevant testimony in question, in particular as providing Child sugary cereal.

that, after Mother admitted to falsifying blood sugar readings, Father was supposed to "take over the care of [Child] at that time to make sure the readings got called in and that she got the correct insulin and the carbs were counted correctly[.]" *Id.* at 63. Ms. Bowser testified that she was advised that Father never did so. *Id.* at 64. Further, she indicated that Father acknowledged that he knew Mother was reporting incorrect blood sugar readings, but did not explain why he did not contact BCCYF or Child's medical provider. *Id.* at 63-64.

A second investigation, again related to medical neglect, was opened in February 2016. *Id.* at 64. While meeting with Father on February 18, 2016, Amy Dodson, a registered nurse who provided education services through Home Nursing Care, discovered that there were no documented readings from a period where the family reported being away,[10] the glucometer that had been used was broken, and Child had a high reading after eating surgery cereal that morning. N.T., 10/4/16, at 32-35. Ms. Dodson expressed "concerns over the fact that we weren't able to see any blood sugars and know that they were being recorded or reported accurately at this point." *Id.* at 37. Child was removed and placed into foster care the same day. N.T., 5/3/17, at 23; N.T., 11/21/16, at 65.

---

[10] BCCYF and service providers reported a lack of access and/or difficulty contacting Mother and Father for approximately a one to two-week period. N.T., 11/21/16, at 61; N.T., 10/4/16, at 7-9.

This investigation was ultimately indicated against both Mother and Father. N.T., 11/21/16, at 65. As explained by Ms. Bowser, the investigation was indicated as "the failure to follow through with what the doctor was saying put [Child] at risk and what the doctor's information that they gave to us that also stated that failure to follow through with the insulin and carb counting would cause severe injury or death to the child." *Id.* at 65-66. By order dated November 21, 2016, and entered November 23, 2016, the trial court entered a finding of abuse against both Mother and Father. Order, 11/23/16. Notably, Father did not appeal this finding.

Child began treatment at Geisinger in December 2015 after transfer from Children's Hospital of Pittsburgh.[11] N.T., 11/21/16, at 10. Dr. Rashita Tiwari, a pediatric endocrinologist at Geisinger who was involved in Child's treatment and also stipulated to by counsel as an expert in pediatric endocrinology, *id.* at 7-8, testified that Mother and Father were given a lot of education due to issues controlling Child's diabetes, which was noted upon transfer to Geisinger from Children's Hospital of Pittsburgh. *Id.* at 10. She later described this education as "extensive." *Id.* at 11. Significantly, from the time treatment began in December 2015 until Child was placed in February 2016, Dr. Tiwari observed "no improvement in the parents['] ability

_____

[11] Mother and Father transferred Child's care from Children's Hospital of Pittsburgh after learning the hospital was responsible for the report initiating the first investigation by BCCYF. N.T., 11/21/16, at 10, 62.

to either [] manage [Child's] healthcare or [] effectively communicate with the hospital staff when her care or her levels were in question or problematic[.]" *Id.* at 32-33. More importantly, Dr. Tiwari opined that "the actions or lack of actions taken by the parents over this course of time…endanger[ed] the [C]hild's health." *Id.* at 33.

Further, when asked if, given the history, she would trust Mother and Father to care for Child medically, Stacy Tovich, certified nurse practitioner and certified diabetic educator in pediatric endocrinology, who was also involved in Child's treatment at Geisinger and stipulated to by counsel as an expert in pediatric endocrinology, *id.* at 49, responded, "No. No. I can't medically, I can't put her at risk because it only takes a day or two of not getting enough insulin not getting blood sugars tested for a child to go into diabetic ketoacidosis which if not caught in time children can die from." N.T., 11/21/16, at 56. Ms. Tovich expressed difficulty trusting either Mother or Father to follow-through with what they were taught. *Id.* at 55-56. Ms. Tovich stated,

> [K]nowing how to do something and actually doing it are two different things. And so giving them the education and knowing that they know how to test the blood sugar and how to count carbs and how to give insulin--to teach them how to do that and have them tell me back in an appointment this is what I'm supposed to do, that is very--that is something that anyone can do. It is actually following through and the follow-through was the issue that we were having with the family--with her parents is that her blood sugars were not being tested when they were supposed to be. Insulin wasn't given when it was supposed to be. And that is the hard part. And then they would call in and give us blood sugars that weren't actually accurate. They would

- 14 -

give us blood sugars that looked really good and then when they would come to the appointment and we would actually see the meter, the blood sugars on the meter did not match what the blood sugars were that they had been calling in and verbally giving us. So to develop that type of trust again, it is going to be very hard. How do you send a child back into that environment and just cross my fingers and hope that they are going to do it.

*Id.* Ms. Tovich also offered that neither Mother nor Father had attended Child's appointments since May 26, 2016. *Id.* at 54.

Similarly, Patricia Parks, registered nurse with Peritech Pediatric Home Health Agency, who provided diabetic education on two separate occasions after Child's placement,[12] also expressed concern as to Father's follow-through. N.T., 5/3/17, at 54. While not questioning Father's knowledge and education, Ms. Parks did, however, question his actions. *Id.* Ms. Parks stated,

My knowledge of that was he was knowledgeable in the care[,] the counting, giving the injections. What I couldn't promise when I am done is if he's going to follow…through with it[.] [S]o I was teaching--my understanding is he--they already had 2 or 3 agencies then prior to me going in for teaching also[.] [S]o knowledge base[,] he had the basic knowledge of the care for her[.] Now[,] whether or not the follow through was going to go[,] I can't say for sure[,] because two of my four visits with just him he never showed.

*Id.*

---

[12] Ms. Parks first provided education to both Mother and Father commencing in April 2016 and ending in May 2016. Sessions were reinstated for Father in August 2016. N.T., 5/3/17, at 52-53.

Moreover, Father has demonstrated continued personal instability. The current BCCYF caseworker at the time of the termination hearing, Mackenzie Bagley, testified to Father residing in six different residences since BCCYF became involved with the family, including two residences in Wayne County, Pennsylvania.[13] *Id.* at 27-28. Ms. Bagley confirmed that, as a result of this residential instability, Father is not in a place to take Child back into his care. *Id.* at 28-29. Further, evidence was presented of the volatile nature of some of Father's personal relationships. Dana Giger, New Steps family worker, who provided preservation and reunification services to the family over an extended period of time, described the relationship between Mother and Father as "unstable." *Id.* at 12. In addition, Father's mother obtained a Protection from Abuse Order against him, resulting Father's return to Blair County from Wayne County. N.T., 2/28/17, at 43-44.

Ms. Giger likewise characterized Father as "inconsistent" over her time working with him from February to September 2016. N.T., 5/3/17, at 13. While she noted that Father displayed some progress while engaging in mental health services, which included counseling and medication management, Father ceased these services and did not feel he needed to

---

[13] Ms. Bagley had not been able to assess Father's most recent residence as he had just signed a lease the day prior to the termination hearing. N.T., 5/3/17, at 30.

reinitiate them. *Id.* at 9-11. Relatedly, Ms. Bagley testified that she was not aware that Father reinstituted counseling and was taking medication. *Id.* at 29. Ms. Giger's services then unexpectedly ended when Father advised that he had moved to Wayne County. *Id.* at 13. Notably, Ms. Giger indicated that she would have a concern if Child would have been returned to Father based on her understanding of Child's medical needs. *Id.*

Lastly, Father did not appear for the rescheduled termination hearing on May 3, 2017, unbeknownst to his attorney, demonstrating the lack of seriousness and magnitude Father attributed to the proceedings.[14] *Id.* at 1. On this topic the court stated,

> [W]e felt certain we had communicated at the 12-month hearing the gravity of the imminent decision on May 3rd for termination of parental rights. Father's absence therefore, provided evidence that Father either had no helpful evidence to promote his resumption of custody or demonstrates his lack of ability to grasp the seriousness of the situation, which reflects on his problem solving and rational thinking, both required for effective parenting-especially in regard to a special needs child such as [Child]….

T.C.O. at 7.

As a result, Ms. Bagley, therefore, expressed concern with regard to reunification, testifying as follows:

> Q. At this point and time based on the totality of the circumstances that have taken place in this case to date does

---

[14] As reported to Ms. Bagley, Father did not want to request off as he was on a probationary period at a new job. N.T., 5/3/17, at 30.

the agency have any confidence that the child could be successfully reunified with either parent and basically maintaining safe stable environment moving forward?

A. I have concern over just lack of a personal stability with each of them and just the [] lack of trust from the medical providers that either one would be able to care for [Child] from this point forward giving the case history medically wise and regardless of the education that they receive with the agency and medical professionals can't ensure [Child's] safety with either one of them.

N.T., 5/3/17, at 38.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is

- 19 -

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent….

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Father's parental rights favors Child's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated,

> Finally, the [c]ourt must analyze 2511 (b) as to the best interests of [Child] and her bonding with her birth parents. [BCCYF] placed [Child] with [foster parents] for a brief time before she resided with her [m]aternal [g]reat-[g]randparents and returned her to [foster parents] when the [g]reat-[g]randparents indicated they could not continue the care for custody. She has remained there for over one (1) year. The caseworker, Mackenzie Bagley, testified that [Child] is thriving in [foster parents'] home. She has also bonded with the two (2) siblings of [foster parents]. The doctors treating [Child] have praised [foster parents] for their care of [Child] and her progress. They have made every appointment, had every training recommended and[,] if [foster parents] adopt [Child][,] the medical professionals will approve an insulin pump for her. The caseworker observed [Child] in the foster home and she appears natural and well bonded in her interactions. [Foster parents] remain available as an adoptive resource.

> Both Mother and Father have worked to maintain visits with [Child] as they have been able to so do; however, long-term consistency has not occurred. The parents received visits at the Path House and also received Bridging the Gap services for them as parents of a placed child. During the time the parents moved out of county, visits were less regular and [Child] had no adverse reaction brought to the attention of the [c]ourt.

The [c]ourt never received any reports of [Child] having any adverse reaction to separating from her parents after visits. To the contrary, [Child] has bonded, over the last year, with [foster parents] who have provided the stability, security and daily regimental medical care (insulin and "counting carbs") necessary to control her Type 1 [d]iabetes. Accordingly, we find the foster home has met the needs and welfare of [Child]. The clear and convincing evidence of her well-being exists in her ability to thrive emotionally and developmentally consistently in [foster parents'] home by all accounts over the last 12-months or one third of her life. Mother and Father have failed to demonstrate they have the capacity to manage the complicated care management of [Child][,] which requires great diligence and vigilance.

We have no doubt both Mother and Father love [Child] and just as clearly, we have no doubt [Child] would not suffer physical or emotional harm with the termination of her parents' rights as any bond has sadly become minimal after the last 12 months of her needs being met elsewhere.

T.C.O. at 13-14 (citation to record omitted).

Father, however, argues error in terminating his parental rights pursuant to subsection (b) as "any medical issues that precipitated [Child's] placement were beyond Father's control, and there was no evidence on record to suggest that Father would neglect [Child]'s medical needs as Mother had done." Father's Brief at 21. Father points to the fact at the time of Child's removal he was dealing with an injury and Mother was providing the primary care for Child's diabetes. *Id.* at 21-22. He further maintains that he was not afforded the opportunity to demonstrate that he was able to provide appropriate care. *Id.* at 22. Hence, Father argues that his parental rights were terminated for reasons beyond his control. *Id.*

Upon review, the record supports the trial court's findings and determinations that Child's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b), and we find no abuse of discretion or error of law. *In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267. Hence, termination pursuant to Section 2511(b) was proper.

While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

- 22 -

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/16/2017</u>